IN THE UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DINA M. OWENS, | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | 1:13-CV-02504 |
| | : | |
| CAROLYN W. COLVIN, ACTING | : | (JUDGE MARIANI) |
| COMMISSIONER OF SOCIAL | : | |
| SECURITY, | : | |
| | : | |
| Defendant | : | |

## MEMORANDUM

### Introduction

Plaintiff Dina M. Owens has filed this action seeking review of a decision of the

Commissioner of Social Security ("Commissioner") denying Owens' claim for social security

disability insurance benefits and supplemental security income benefits.

Disability insurance benefits are paid to an individual if that individual is disabled and

"insured," that is, the individual has worked long enough and paid social security taxes.

Owens met the insured status requirements of the Social Security Act through June 30,

2010. Tr. 14. In order to establish entitlement to disability insurance benefits Owens was

required to establish that she suffered from a disability on or before that date. 42 U.S.C. §

423(a)(1)(A), (c)(1)(B); 20 C.F.R. §404.131(a)(2008); *see Matullo v. Bowen*, 926 F.2d 240,

244 (3d Cir. 1990).

Owens filed her application for disability insurance benefits on April 16, 2010 and filed her application for supplemental security income benefits on May 27, 2011, claiming that she became disabled on January 11, 2010.[1]  Tr. 110, 113.  Owens has been diagnosed with several impairments, including left hip bursitis, breast abscesses, "bilateral breast problems," major depressive disorder, post-traumatic stress disorder ("PTSD"), polysubstance dependence, and bipolar disorder.  Tr. 14-15, 587.  On October 20, 2010, Owens' applications were initially denied by the Bureau of Disability Determination.  Tr. 60.

A hearing was conducted by an administrative law judge ("ALJ") on March 16, 2012, where Owens was represented by counsel.  Tr. 26-57.   On May 21, 2012, the ALJ issued a decision denying Owens' applications, and on August 22, 2013, the Appeals Council declined to grant review.  Tr. 1, 12-23.  Owens filed a complaint before this Court on October 4, 2013, and this case became ripe for disposition on April 14, 2014, when Owens filed a reply brief.

Owens appeals the ALJ's determination on two grounds: (1) the ALJ erred in finding that Owens had not suffered from three episodes of decompensation, and (2) the ALJ erred in accounting for the limitations offered by Owens' treating physician.  For the reasons set forth below, this case is remanded to the Commissioner for further proceedings.

---

[1] These cases were later consolidated.  Tr. 12.

2

## Statement of Relevant Facts

Owens was forty-nine years of age at the time the ALJ rendered his opinion, has a high school degree, and is able to read, write, and understand the English language. Tr. 36, 135. Owens has no past relevant work experience.[2] Tr. 52.

### A.    Owens' Mental Impairments[3]

On April 30, 2010, Owens presented to the Veteran Administration's Outpatient Clinic for a physical examination. Tr. 207. Owens denied any depression or mental health issues, and screenings for depression or PTSD both came back negative. Tr. 208, 213. However, by May 18, 2010 when Owens sought treatment for alcohol and drug abuse, she scored a twenty-five on the Beck Depression Inventory II Test, "which is consistent with [a] moderate level of depression." Tr. 204. Owens reported a history of suicidal ideation, and reported a prior suicide attempt in 2004. Tr. 204-05.

On July 28, 2010, Owens underwent a mental health consultation with Beth Ellen Nease, PAC. Tr. 355. Owens reported feelings of worthlessness, hopelessness, and helplessness, as well as irritability, crying, poor appetite, and poor sleep. Tr. 356. Owens was cooperative, had fluent speech, a euthymic mood, an appropriate affect, and a spontaneous thought flow. Tr. 357. She was alert and oriented with good concentration

---

[2] Though Owens did have work experience, none of that work rose to the level of substantially gainful employment, and thus does not qualify as past relevant work. Tr. 52.

[3] Owens' points of appeal relate only to her mental impairments; thus, evidence of her physical impairments will not be addressed here.

3

and memory, but had "very poor" judgment and "very poor" insight. *Id.* Ms. Nease assigned a GAF score of sixty.[4]  Tr. 358.

On August 11, 2010, Owens admitted herself to a substance abuse treatment program at the Veteran Administration's Domiciliary Rehabilitation Treatment Program, where she remained for in-patient treatment until September 24, 2010.  Tr. 235, 331.  At her initial intake, Owens was tearful and reported drinking up to "1/5th of Black Velvet daily[.]"  Tr. 334.  Owens stated that she wanted to die, but would not kill herself; she could not see herself "as ever being happy again." *Id.*

Owens was later given a suicide risk assessment and psychological evaluation by Dr. Stephen Dunn, a licensed psychologist.  Tr. 299.  Dr. Dunn noted that Owens appeared depressed, but opined that she had a low risk of suicide. *Id.*  Owens was tearful, but in control of her basic emotions.  Tr. 300.  She had a dysphoric mood, constricted affect, and low energy; Dr. Dunn observed evidence of anhedonia. *Id.*  Owens had recurrent thoughts of death and feelings of worthlessness, but her recent and remote memory were intact. *Id.*

During her time in the rehabilitation program, Owens was twice examined by Shaukat Amanullah, M.D.  Tr. 252-58, 286-92.  On September 1, 2010, Owens presented to Dr. Amanullah to discuss recurrent nightmares and sleep issues that had not been controlled with the use of medication.  Tr. 286.  Owens had a depressed mood, a mood-

---

[4] A GAF score between 51 and 60 indicate moderate symptoms (e.g., circumstantial speech and occasional panic attacks or moderate difficulty in social or occupational functioning as evidenced by . . . conflicts with peers or coworkers). *Diagnostic and Statistical Manual of Mental Disorders*, 34 (4th ed., Text rev., 2000).

4

congruent affect, and was pleasant, polite, and cooperative.  Tr. 288.  Her speech was

fluent and coherent; her though flow was spontaneous, linear, logical, and goal directed.  *Id.*

Owens was alert and oriented, she had intact memory, and her attention and judgment were

fair.  *Id.*  Dr. Amanullah assigned a GAF score of fifty-five, diagnosed Owens with

depressive disorder, and increased Owens' dose of Trazodone and prescribed Vistaril to

ease Owens' anxiety and insomnia.  *Id.*

Owens returned to Dr. Amanullah on September 17, 2010 complaining of increased

traumatic nightmares related to PTSD.  Tr. 252-53.  She reported feeling depressed, and

felt that she was "not emotionally stable enough to return back to work."  Tr. 253.  Dr.

Amanullah's findings and diagnoses remained the same as they had been on September 1,

2010, and he again assigned a GAF score of fifty-five.  Tr. 254.

Upon discharge from the drug rehabilitation program, Robert Moran, M.D. diagnosed

Owens with anxiety, depression, PTSD, and alcoholism in recovery.  Tr. 236.  It was noted

that Owens was "exhibiting symptoms of PTSD and emotional instability and overwhelming

guilt about that fact that one of her sons was born disabled due to her crack use."  Tr. 228.

Belita Baily, an addiction therapist, opined that it was "not certain that [Owens] can maintain

employment over an extended period due to her mental problems as well as physical

problems[.]"  Tr. 229.  Owens had no feelings of hopelessness or helplessness, and had no

thoughts of suicide.  *Id.*

On October 15, 2010, Owens returned to Dr. Amanullah for a follow-up appointment. Tr. 501. Despite taking her medications as prescribed, Owens still felt depressed and continued to have nightmares. *Id.* Owens had a depressed and worried mood, but her mental status examination was otherwise normal. *Id.* Dr. Amanullah assigned a GAF score of fifty-five. Tr. 502.

On November 18, 2010, Louis Brancaleone, M.D. examined Owens. Tr. 496-500. Owens reported difficulties adjusting to sobriety, and stated that "now that I'm sober and clean, I have urges to cut myself" because cutting "gives me a release." Tr. 496. Dr. Brancaleone assigned a GAF score of fifty,[5] and referred Owens to a residential in-patient treatment program at Perry Point. Tr. 500. The next day, Owens presented to Dr. Amanullah complaining of continuing anxiety and depression. Tr. 491-92. A mental status examination was normal, and Dr. Amanullah assigned a GAF score of fifty-five. Tr. 492.

Upon admission to the Perry Point treatment program on December 20, 2010, Dr. Srikumar Menon noted that Owens engaged in several self-destruction behaviors. Tr. 484-85. Dr. Menon noted that Owens had attempted suicide in 2007, and had recently begun self-mutilating "to feel better." Tr. 485. Prior to self-mutilating, Owens "used to punch [her] face and dig [her] nails into [her] face." *Id.* At that appointment, Owens was alert and oriented with intact memory, judgment, and insight; she was also pleasant and cooperative

---

[5] A GAF score of 41–50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) [or] any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Diagnostic and Statistical Manual of Mental Disorders*, 34 (4th ed., Text rev., 2000).

during the encounter. Tr. 489. Dr. Menon diagnosed Owens with PTSD and polysubstance abuse, and assigned a GAF score of forty.[6] Tr. 490.

During her time at the Perry Point treatment program, Owens attended four psychotherapy sessions with Christine Calms, Ph.D. Tr. 466-72. At all four appointments, Owens had an appropriate appearance and behavior, and coherent speech. *Id.* She also demonstrated "adequate" attention and concentration. Tr. 469-72. Owens continued to express anger, irritability, anxiety, and depression; she continued to feel urges to cut herself, particularly when she became upset or received negative feedback. Tr. 466-72. At her final appointment with Dr. Calms on February 16, 2011, Owens was assessed with a GAF score of fifty-five. Tr. 466. On February 17, 2011, Dr. Menon noted that Owens had an improved mood with no suicidal or homicidal ideation and cleared her for discharge from the program. Tr. 465.

On February 24, 2011, Owens presented to Shahnoor Khan, M.D. Tr. 460. Owens reported that she was "very anxious" after her discharge from the Perry Point program and admitted that she self-mutilated, but stated that she had "been trying hard not to hurt herself[.]" *Id.* Owens reported mood swings with hypomania, decreased sleep, racing thoughts, impulsive spending, flashbacks, and nightmares from past abuse. Tr. 461. Owens had been sober since August 11, 2010. *Id.* Dr. Khan noted that Owens had a normal appearance; was pleasant, polite, and cooperative; had fluent and coherent speech;

---

[6] A GAF score of 31-40 signifies "some impairment in reality testing or communication ... or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood." *Diagnostic and Statistical Manual of Mental Disorders*, 34 (4th ed., Text rev., 2000).

her thought flow was spontaneous, linear, logical, and goal directed; she was alert and oriented; her memory was intact, and; her attention and judgment were fair.[7] *Id.* Owens' mood was anxious, though her affect was euthymic. *Id.* Dr. Khan assigned a GAF score of sixty-five[8] and opined that Owens was "psychiatrically stable." *Id.* He diagnosed Owens with bipolar disorder, PTSD, and a history of polysubstance abuse. *Id.*

Owens returned to Dr. Kahn three times during March 2011. Tr. 450-52, 456-59, 715-24. Owens continued to report feelings of depression and anxiety, as well as continued problems with sleep. *Id.* Owens felt a continued desire to hurt herself, and believed she would be better off dead. *Id.* At all appointments, Dr. Khan repeated diagnoses of bipolar disorder, PTSD, and a history of polysubstance abuse; Dr. Khan also continued to assess a GAF score of sixty-five. *Id.* By March 16, 2011, Owens reported "feeling good" with medication; she was no longer experiencing mood swings and no longer had nightmares. Tr. 450. On April 28, 2011, Owens reiterated to Dr. Khan that she was feeling good with the use of Seroquel, and was not having mood swings. Tr. 692.

Despite Owens' apparent improvement, on May 7, 2011, she was hospitalized at the Chambersburg emergency room following a suicide attempt. Tr. 640-41. Owens had suicidal thoughts, and reported that she had been hurting herself. Tr. 640. Eric Wells, M.D.

---

[7] Dr. Khan repeated these findings at every appointment. Tr. 451, 457, 655, 675, 692, 716, 796-97.

[8] A GAF score of 61-70 is indicative of "some mild symptoms" such as depressed mood and mild insomnia, or some difficulty in social, occupational, or school functioning, but generally the individual is functioning well and has some meaningful interpersonal relationships. *Diagnostic and Statistical Manual of Mental Disorder,* 32 (4th ed. Text rev. 2000).

8

noted that Owens had made "several very shallow lacerations with a pair of scissors across her left wrist." *Id.* Owens was tearful with a depressed mood, and admitted to suicidal ideation. *Id.* As a result of this incident, Owens was placed on the high suicide watch list until August 18, 2011. Tr. 644, 671.

On May 18, 2011, Owens was examined by Dr. Khan. Tr. 674. Owens complained of depression and anxiety due to a planned breast biopsy. Tr. 675. She continued to have mood instability, agitation, poor sleep, and nightmares. *Id.* Dr. Khan assessed Owens with a GAF score of fifty-five, and reiterated diagnoses of bipolar disorder, PTSD, and a history of polysubstance abuse. Tr. 676. On July 13, 2011, Owens reported that she was still experiencing anxiety and nightmares, as well as racing thoughts. *Id.* Dr. Khan assigned a GAF score of fifty. Tr. 655.

On September 22, 2011, Dr. Vicki Verdeyen, a clinical psychologist, evaluated Owens and diagnosed her with PTSD and bipolar disorder. Tr. 824. Dr. Verdeyen opined that these mental impairments resulted in "occupational and social impairment with reduced reliability and productivity." Tr. 827. Owens reported that she had relapsed with alcohol and marijuana in June 2011, and had mutilated herself around that time. Tr. 806-07.

On October 26, 2011,[9] Owens presented to Dr. Khan for the final appointment that was contained within the administrative record. Tr. 796-803. Owens complained of anxiety and admitted that she had been drinking one bottle of whiskey every two or three days. Tr.

---

[9] During this time period, Owens had several individual psychotherapy sessions with Amber Guzman. Tr. 795, 803, 805.

796. Dr. Khan again diagnosed Owens with bipolar disorder, PTSD, and a history of polysubstance abuse. Tr. 797. Dr. Khan assessed Owens with a GAF score of fifty, and increased her dose of Geodon. *Id.*

## B.    Residual Functional Capacity Assessments

On October 18, 2010, Salvatore Cullari, Ph.D. reviewed Owens' report of activities of daily living and completed a mental residual functional capacity assessment. Tr. 373-85. Dr. Cullari did not have access to any of Owens' mental health records. Tr. 392. Dr. Cullari opined that Owens did not have any severe mental impairment, and stated that Owens had no prior mental health treatment. Tr. 373, 385. He further believed that Owens suffered from only mild restrictions in her activities of daily living, mild difficulties maintaining social functioning, and mild difficulties maintaining concentration, persistence, or pace. Tr. 383. The ALJ rejected Dr. Cullari's opinion because "[e]vidence received after [Dr. Cullari] issued the opinion" rendered Dr. Cullari's opinion outdated. Tr. 20.

On May 18, 2011, Dr. Khan completed a mental residual functional capacity assessment. Tr. 587-93. Dr. Khan reiterated diagnoses of bipolar disorder, PTSD, and polysubstance abuse. Tr. 587. He opined that Owens was not a malingerer, and stated that her prognosis was poor. Tr. 588. Dr. Khan believed that Owens' mental impairments would cause her to miss, on average, more than three days of work each month. Tr. 589.

Dr. Khan opined that Owens had marked limitations[10] in her ability to: (1) accept instructions and respond appropriately to criticism from supervisors, (2) get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, (3) understand and remember detailed instructions, and (4) carry out detailed instructions.  Tr. 590-91.  Dr. Khan also opined that Owens was moderately limited[11] in numerous areas, most notably in her ability to make simple work-related decisions, perform at a consistent pace without an unreasonable number and length of breaks, deal with the stress of semiskilled or skilled work, and sustain an ordinary work routine without special supervision. *Id.*  Dr. Khan opined that Owens' mental impairments had begun in February 2010.  Tr. 593. He also stated that Owens had been sober since August 11, 2010, and opined that substance did not "seem to play a major role" in Owens' limitations.  Tr. 592.

## C.    The Administrative Hearing

On March 16, 2012, Owens' administrative hearing was conducted.  Tr. 29-57. Owens testified that she still suffered from anxiety and depression, often cried, and did not "feel like living."  Tr. 39, 40.  Owens admitted that she was drinking again, but only drank once a month "to take the edge off the stress[.]"  Tr. 38.  The last time Owens had cut herself was May 2011; she had cut herself due to stress and other difficult situations in her life.  Tr. 38-39.  Though the desire to harm herself remained, Owens had learned

---

[10] Marked limitation was defined as "[t]here is serious limitation in this area.  The ability to function is severely limited but not precluded."  Tr. 589.

[11] Moderate limitation was defined as "[t]here is moderate limitation in this area but the individual is still able to function satisfactorily."  Tr. 589.

11

techniques to control that desire. Tr. 39. Owned still had difficulties sleeping, although she stated that medication did help her sleep better. Tr. 40, 45.

Owens stated that she drove approximately two times each day, seven days a week in order to attend all of her medical appointments and take her son to his medical appointments. Tr. 36. She cleaned the bathroom every Saturday, and alternated cooking meals and performing other chores with her mother. Tr. 46. Owens' hobbies consisted of decorating rocks, playing games on the computer, and reading self-help books. Tr. 47-48. Owens testified that she often felt overwhelmed, and even putting on her makeup or cooking a meal could overwhelm her. Tr. 48-49.

After Owens testified, Paul Anderson, an impartial vocational expert, was called to give testimony. Tr. 52. The ALJ asked Mr. Anderson to assume a hypothetical individual with Owens' age, education, and work experience that was limited to light work.[12] Tr. 52-53. However, the hypothetical individual was limited to routine, repetitive tasks with no public contact, and could only occasionally interact with co-workers and supervisors. Tr. 53. Mr. Anderson opined that, given these restrictions, the hypothetical individual would be capable

---

[12] Light Work is defined by the regulations of the Social Security Administration as work "with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 416.967.

of performing two jobs that exist in significant numbers in the national economy: an egg washing machine operator and a food industry sorter. *Id.*

The ALJ then modified the hypothetical such that all limitations remained in place, except that the individual was limited to sedentary work.[13] *Id.* Mr. Anderson testified that the individual would be able to perform work as a table worker or as a carding machine operator. Tr. 53-54. Mr. Anderson stated that an individual would not be able to maintain unskilled employment if she missed more than one day of work per month. Tr. 54.

## Discussion

In an action under 42 U.S.C. § 405(g) to review the Commissioner's decision denying a plaintiff's claim for disability benefits, the district court must uphold the findings of the Commissioner so long as those findings are supported by substantial evidence. Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood,* 487 U.S. 552, 565 (1988) (*quoting Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229 (1938)). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. *Brown v. Bowen,* 845 F.2d 1211, 1213 (3d Cir. 1988). In an adequately developed record substantial evidence may be "something less than the weight of the evidence, and the possibility of

---

[13] Sedentary Work is defined by the regulations of the Social Security Administration as work that "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 416.967.

drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," *Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981), and "must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 203 (3d Cir. 2008). Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981).

The Commissioner utilizes a five-step process in evaluating disability insurance benefits claims. *See*, 20 C.F.R. § 404.1520; *Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 91-92 (3d Cir. 2007). This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the residual functional capacity to return to his or her past work and (5) if not,

14

whether he or she can perform other work in the national economy.  20 C.F.R. § 404.1520.

The initial burden to prove disability and inability to engage in past relevant work rests on

the claimant; if the claimant meets this burden, the burden then shifts to the Commissioner

to show that a job or jobs exist in the national economy that a person with the claimant's

abilities, age, education, and work experience can perform.  *Mason*, 994 F.2d at 1064.

## A.    ALJ's Residual Functional Capacity Determination in Relation to Owens' Treating Physician Opinion

Owens argues that the ALJ erred in giving "great weight" to the opinion of Dr. Khan,

Owens' treating physician, but then failing to properly account for that opinion.  Owens

specifically argues that the ALJ erred in accepting Dr. Khan's opinion that Owens was

markedly limited in her ability to interact with supervisors or co-workers, while

simultaneously allowing occasional contact with co-workers and supervisors.  Owens further

argues that Social Security Ruling ("SSR") 85-15 mandates a finding of disability under

these particular circumstances.  The Commissioner in turn argues that the ALJ was not

required to adopt all of Dr. Khan's assessed limitations, and argues that the residual

functional capacity assessment as a whole is supported by substantial evidence.  Finally,

the Commissioner argues that SSR 85-15 is not applicable in this case.

### i.    Social Security Ruling 85-15

SSR 85-15 was implemented "to emphasize, in the sections [of the Medical

Vocational Guidelines contained in Appendix 2] relating to mental impairments . . . that the

potential job base for mentally ill claimants without adverse vocational factors is not

15

necessarily large even for individuals who have no other impairments, unless their remaining mental capacities are sufficient to meet the intellectual and emotional demand of at least unskilled, competitive, remunerative work on a sustained basis[.]" *See*, SSR 85-15, 1985 WL 56857 at *1. SSR 85-15 further states that unskilled work requires the ability "to respond appropriately to supervision, coworkers, and usual work situations . . . [a] loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base. This, in turn, would justify a finding of disability[.]" *Id.*, at *4.

Generally, Social Security Rulings "are binding on all components of the Social Security Administration." 20 C.F.R. §402.35(b)(1). *See also*, *Heckler v. Edwards*, 465 U.S. 870, 873 n. 3 (1984). However, SSR 85-15 by its own language is not binding upon the Commissioner. SSR 85-15 emphasizes that Appendix 2 only provides a framework for considering disability, and does "not direct conclusions of disabled or not disabled." SSR 85-15, 1985 WL 56857 at *1. *See also*, *Fahy v. Astrue*, CIV.A. 06-CV-366, 2008 WL 2550594 (E.D. Pa. June 26, 2008) ("SSR 85-15, by its own terms, makes clear that it is a mere framework, and does not 'direct conclusions of disabled or not disabled.'"); *King v. Astrue*, CIV.A. No. 08-176, 2009 WL 2485859, at *6 (W.D. Pa. Aug. 19, 2009) (stating that SSR 85-15 "is probative of the way in which Plaintiff's non-exertional impairments impact the occupational base.").

Consequently, SSR 85-15 emphasizes that it would be "appropriate" for an ALJ to find an individual disabled if she suffers from "a substantial loss of ability to respond

appropriately to supervision [or] coworkers[.]" SSR 85-15, 1985 WL 56857 at *1. It does not mandate such a finding. Here, the ALJ instead relied on the testimony of a vocational expert to determine whether Owens was disabled. Tr. 52-55. Because SSR 85-15 operates only as a framework for decisions, the ALJ did not err in relying on vocational expert testimony rather than SSR 85-15.

ii.     Marked Limitations as Applied to Owens' Residual Functional Capacity

Of greater concern than the ALJ's decision not to apply SSR 85-15 is the ALJ's manner of accounting for Dr. Khan's medical opinion. The ALJ gave great weight to Dr. Khan's opinion that Owens had marked limitations in her ability to "accept instructions and respond appropriately to criticism from supervisors" as well as her ability to "get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes." Tr. 19, 590-91. In giving great weight to Dr. Khan's opinion, the ALJ reasoned that "Dr. Khan is a highly qualified psychiatrist who had the opportunity to observe, treat, examine, and evaluate the claimant over a longitudinal period; his opinion is consistent with his clinical findings and observations . . . and his opinion is consistent with the record as a whole[.]" Tr. 19. However, in translating those limitations into a residual functional capacity determination, the ALJ merely limited Owens to "occasional interaction with coworkers and supervisors." Tr. 17. The ALJ erred in this respect.

The form that Dr. Khan completed when he rendered his opinion defined marked limitations as "severely limited but not precluded." Tr. 589. The ALJ explicitly recognized

17

and adopted this definition in his opinion. Tr. 19. In contrast to this definition, the Social Security Administration has defined occasional as "up to one-third" of an eight hour workday. *See*, SSR 83-10.

"Severely limited" is inconsistent with the ability to perform an action for up to one-third of the workday, and necessarily encompasses more severe limitations than those prescribed by the ALJ. The best representation of a "severely limited but not precluded" limitation would be an ability to rarely, not occasionally, interact with co-workers or supervisors. Consequently, the ALJ failed to sufficiently account for Owens' marked limitations, and remand is required to properly address those limitations. *See*, *Reveteriano v. Astrue*, 490 F.App'x 945, 948 (10th Cir. 2012) (noting that the term "'seriously limited but not precluded' is not 'evidence of ability' but 'evidence of *disability*'") (*quoting Cruse v. U.S. Dep't of Health & Human Servs.*, 49 F.3d 614, 618 (10th Cir. 1995), *superseded on other grounds by regulation*). *See also*, *Trout v. Astrue*, 3:11-cv-1572, 2013 WL 139257, at *10 (M.D. Pa. Jan. 10, 2013) (holding that limiting a claimant to "occasional interaction with the public, coworkers, and supervisors" is inconsistent with a finding that the claimant suffers from marked limitations in social functioning).

This conclusion is reinforced by the ALJ's decision to limit Owens to "no contact with the public[.]" Tr. 17. Dr. Khan opined that Owens was moderately limited in her ability to interact appropriately with the general public; moderate limitation was defined as "able to function satisfactorily." Tr. 589, 591. If an individual must be limited to no contact with the

18

public despite an ability to function satisfactorily, then surely an individual with serious limitations in her ability to interact with co-workers is not capable of interacting with co-workers for up to one-third of the day. The ALJ did not express any reason for this inconsistency or the seeming change in the weight he gave to Dr. Khan's opinion.

Of additional concern in this case is the ALJ's failure to account for much of Dr. Khan's remaining opinion. Dr. Khan opined that Owens was moderately limited in fifteen different functional areas; the only moderate limitation that the ALJ addressed, either directly or indirectly, was Owens' limited ability to interact appropriately with the general public. Tr. 17-20, 590-91. Owens was moderately limited in several areas that would seriously impact her ability to perform work on a sustained basis, including moderate limitations in her ability to make simple work-related decisions, deal with normal work stress, and sustain an ordinary routine without special supervision. Tr. 590.

Moderate limitation in these activities does not mean that Owens was incapable of performing such activities; the definition of moderate emphasizes that Owens is capable of functioning satisfactorily. Tr. 589. However, moderate limitation does not mean no limitation at all, and the ALJ must accommodate Owens' moderate limitations in some meaningful way.[14] *See*, *Reveteriano*, 490 F.App'x at 948 (stating that "a 'moderate' limitation 'is not the same as no impairment at all' and thus cannot be ignored as a potential element in a claimant's RFC") (*quoting Haga v. Astrue*, 482 F.3d 1205, 1208 (10th Cir.

---

[14] There is no indication that the ALJ rejected this portion of Dr. Khan's opinion. However, if the ALJ had rejected these limitations, he was required to provide some reason for rejecting this portion of Dr. Khan's opinion. *See*, *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000).

2007)).  *See also*, *Monica v. Astrue*, Civ.A. 10-259J, 2012 WL 1033631, at *3-4 (W.D. Pa.

Mar. 27, 2012); *Tung Thinh Lam v. Astrue*, Civ.A. 09-4331, 2011 WL 1884006, at *14 (E.D.

Pa. Mar. 31, 2011).

### B.     Additional Errors in the ALJ's Treatment of Dr. Khan's Opinion

Despite giving "great weight" to Dr. Khan's opinion as a whole, the ALJ gave "little

weight" to Dr. Khan's opinion that Owens would likely miss three or more days of work per

month due to her mental impairments.  Tr. 19, 589.  The ALJ gave little weight to this portion

of Dr. Khan's opinion for the sole reason that "Dr. Khan did not provide any narrative

support for his assessment of the claimant's absenteeism[.]"  Tr. 19.

As a general matter, "check-box" forms that are unaccompanied by narrative

explanations or "evidentiary corroboration" are "weak evidence at best." *Mason v. Shalala*,

994 F.2d 1058, 1065 (3d Cir. 1993).  However, where such a form is accompanied by

supporting evidence and medical records, an ALJ may not reject that opinion based solely

on the fact that it is unaccompanied by narrative support.  *See*, *Natale v. Comm'r of Soc.*

*Sec.*, 651 F. Supp. 2d 434, 455 (W.D. Pa. 2009); *see also*, *Troup v. Astrue*, CIV.A. 11-36,

2012 WL 1355592, at *13 (W.D. Pa. Apr. 18, 2012).

Dr. Khan's opinion that Owens would miss, on average, three or more days of work

per month did not exist in isolation; this opinion was part of the comprehensive form that Dr.

Khan submitted detailing Owens' functional limitations.  Tr. 587-93.  Dr. Khan's opinion was

supported by his own treatment notes and medical records spanning several months.  Tr.

450, 456, 460, 674, 692, 715. Additionally, the ALJ gave "great weight" to other opinions contained within Dr. Khan's evaluation because he was "a highly qualified psychiatrist," he had "the opportunity to observe, treat, examine, and evaluate the claimant over a longitudinal period," and his opinions were "consistent" with his findings and observations, as well as the record as a whole. Tr. 19. All three reasons provided by the ALJ for accepting Dr. Khan's other opinions apply with equal force to the opinion that Owens would miss at least three days of work each month. Dr. Khan's opinion was supported by medical records and treatment notes, and therefore the ALJ erred in rejecting this opinion solely because it was not supported by a narrative explanation.

Finally, it should be noted that the ALJ failed to find that bipolar disorder was a medically determinable impairment, despite according great weight to Dr. Khan's opinion. Tr. 14-15, 19-20. Dr. Khan repeatedly diagnosed Owens with bipolar disorder, and listed bipolar disorder as the first diagnosis on the mental residual functional capacity assessment form. Tr. 450, 456, 461, 587, 675, 715, 797. An ALJ commits reversible error where he or she fails to consider all medically determinable impairments when reaching a residual functional capacity determination. *See, e.g., Shannon v. Astrue*, 4:11-CV-00289, 2012 WL 1205816, at *10 (M.D. Pa. April 11, 2012); *Bell v. Colvin*, 3:12-CV-00634, 2013 WL 6835408, at *8 (M.D. Pa. Dec. 23, 2013); *Stape v. Colvin*, Civil No. 3:13-CV-02308, 2014 WL 1452977, at *6 (M.D. Pa. April 14, 2014); *Jorich v. Colvin*, 3:12-CV-01627, 2014 WL

2462963, at *9 (M.D. Pa. May 29, 2014); *Zerbe v. Colvin*, 3:12-CV-01831, 2014 WL

2892389, at *10 (M.D. Pa. June 26, 2014).

The ALJ's failure to mention Owens' multiple diagnoses of bipolar disorder rendered

his conclusions at step two and step four of the sequential evaluation process defective, and

draws into question the ALJ's ultimate credibility determination. Owens has not raised this

issue on appeal, and therefore this error cannot form the basis of a remand. However,

because remand is required on other grounds, the Court notes this issue to ensure that the

ALJ will properly evaluate Owens' bipolar disorder on remand.[15]

## Conclusion

A review of the administrative record reveals that the decision of the Commissioner

is not supported by substantial evidence. Pursuant to 42 U.S.C. § 405(g), the decision of

the Commissioner is vacated, and this case is remanded for further proceedings.

An appropriate Order will be entered.

BY THE COURT:

Robert D. Mariani
United States District Judge

Dated: September 17, 2014

---

[15] Owens has also argued that the ALJ erred in determining she had suffered from no episodes of decompensation. In her reply brief, Owens clarifies that she contends this error may have directly contributed to the ALJ's decision to reject Dr. Khan's opinion that she would miss three or more days of work per month. As the ALJ must reevaluate Dr. Khan's opinions on remand, Owens' argument is moot, and for that reason will not be addressed.